# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

MARY BECKER,                                      Case No. 1:11-cv-438

       Plaintiff,                               Dlott, J.
                                                Bowman, M.J.

       v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

## REPORT AND RECOMMENDATION

Plaintiff Mary Becker filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents three claims of error for this Court's review. As explained below, I conclude that the ALJ's finding of non-disability should be AFFIRMED, because it is supported by substantial evidence in the administrative record.

### I. Summary of Administrative Record

The current appeal is Plaintiff's second to this Court. The first resulted in remand, and ultimately, an award of benefits for a period of disability beginning on August 27, 2009. However, based upon the Commissioner's failure to make an award for a previously alleged closed period of disability between October 15, 2002 and March 15, 2005, as well as the Commissioner's failure to find that Plaintiff's open period of disability extended back to January 15, 2008, Plaintiff again seeks reversal of the Commissioner's decision.

Plaintiff first protectively filed her application for Disability Insurance Benefits and

Supplemental Security Income benefits on February 12, 2004 (Tr. 64-66), alleging a disability onset date of October 15, 2002. She was 48 years old at the time of her alleged onset date. After her claims were denied initially and upon reconsideration, Plaintiff requested a *de novo* hearing before an administrative law judge ("ALJ"). (Tr. 44). An hearing was held on May 2, 2007 before ALJ Deborah Smith. At the hearing, the ALJ heard testimony from Plaintiff, who was represented by counsel, and from a vocational expert. Plaintiff testified that she found employment and had begun working in 2005; therefore, a closed period of disability was requested only for the period between October 15, 2002 and March 15, 2005.

On May 16, 2007, ALJ Smith issued the first unfavorable decision. (Tr. 15-26). The Appeals Council denied further review, and Plaintiff filed her first appeal in this Court. In a decision filed February 25, 2009, this Court determined that the ALJ's decision was not supported by substantial evidence and remanded the claim back to the Commissioner for further review. (Tr. 375-391).

During the course of her judicial appeal, Plaintiff stopped working; therefore, she filed a second application for benefits on July 18, 2008. That application was consolidated with Plaintiff's prior claim on remand from this Court. A second evidentiary hearing was conducted by ALJ Smith on August 6, 2009, at which Plaintiff provided additional testimony, along with a vocational expert. (Tr. 676-715). However, on August 27, 2009, ALJ Smith issued a second unfavorable decision. (Tr. 358-373). When Plaintiff again sought review before the Appeals Council, that body granted Plaintiff's request. On reconsideration of Plaintiff's claims after remand, the Appeals Council determined that the ALJ had erred, due primarily to a misapplication of a rule concerning Plaintiff's age under the Medical-

Vocational Guidelines.

Ultimately, the Appeals Council determined that Plaintiff was disabled as of August 27, 2009 based upon Rule 202.06 of the Medical-Vocational Guidelines. (Tr. 341-348). The Appeals Council affirmed the ALJ's second decision in most other respects, including the determination that Plaintiff was not disabled during the earlier closed period of disability. Plaintiff now appeals to this Court seeking an additional reversal of the Commissioner's decision concerning Plaintiff's claim for the alleged closed period of disability between 2002 and 2005, as well as for an earlier date of disability onset than that determined by the Appeals Council.

The record reflects that Plaintiff graduated from high school and completed some college course work without attaining a post-secondary degree. On remand, ALJ Smith found that Plaintiff had not engaged in substantial gainful activity either during the requested closed period of disability (October 15, 2002-March 15, 2005), or since January 15, 2008. (Tr. 364). The ALJ determined Plaintiff has the following severe impairments: "chronic obstructive pulmonary disease, moderate spinal stenosis and mild diffuse bulging of the lumbosacral spine, a history of substance abuse, depression, and post traumatic stress disorder." (*Id.*). After finding that none of those impairments, alone or in combination, met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, (Tr. 365), the ALJ determined that Plaintiff retains the residual functional capacity ("RFC") to perform a limited range of unskilled light work, as follows:

> she is limited to lifting, carrying, pushing, and pulling 20 pounds occasionally and 10 pounds frequently. She is able to stand and walk about six hours in an eight hour day and to sit about six hours in an eight-hour day. The claimant could frequently climb ramps and stairs and occasionally climb ladders, and scaffolds. She needs to avoid moderate exposure to fumes,

odors, dust, gases, and poor ventilation. The claimant has had the ability to understand, remember, and carry out simpler job tasks in routine work settings which involve minimal contact with others. She has mild limitations in her ability to perform activities of daily living, and moderate limitation in her ability to relate to others and in her concentration, persistence and pace.

(Tr. 369).

The ALJ further held that Plaintiff had transferable work skills, "including the ability to write contracts, to oversee and direct the work of others, to engage in maintenance repair, use tools and to engage in negotiations." (Tr. 371). Based upon testimony from the vocational expert, and given Plaintiff's age, education, work experience, and RFC, the ALJ concluded that Plaintiff "has acquired work skills from past relevant work that are transferrable to other occupations with jobs existing in significant numbers in the national economy." (*Id.*). Accordingly, the ALJ found that Plaintiff was not under disability, as defined in the Social Security Regulations, and was not entitled to either DIB or SSI benefits. (Tr. 372).

Upon further review, the Appeals Council stated that ALJ Smith had erred by finding that Plaintiff had acquired transferable skills during her employment in *skilled* positions that could be transferred "to other semi-skilled and unskilled jobs which she could still perform." (Tr. 346). The Council held that "the jobs to which the claimant's work skills are transferable <u>must</u> be within the claimant's residual functional capacity and the jobs must be semi-skilled or skilled, <u>not unskilled</u>." (*Id.*, emphasis original). Thus, the ALJ erred by assuming Plaintiff's skills could be used in unskilled jobs, and by citing "semi-skilled jobs [that] are not within the claimant's residual functional capacity (for unskilled work)." (*Id*. at 346-347). Despite the error, the Appeals Council reasoned that the determination that Plaintiff was not disabled was correct for most of the period of claimed disability in issue,

because the transferability of job skills is not material to the determination of disability at younger ages. Instead, the error found by the Appeals Council resulted in a disability determination only for the period of time in which Plaintiff was deemed to be a person of "advanced age."

In this case, Plaintiff has passed through several age categories under the Medical-Vocational Guidelines since her original alleged onset date in October 2002. The Appeals Council determined that Plaintiff passed into the "advanced age" category as of the date of the ALJ's written decision, on August 27, 2009. Technically, based upon her date of birth of September 15, 1954, Plaintiff did not attain the age of 55 until September 15, 2009. However, because Plaintiff was 54 years and 11 months old on the date of the second hearing decision, the Appeals Council held that she should be given the benefit of passing into the "advanced age" category as of the date of that decision on August 27, 2009. Prior to that time, from the first claimed disability period beginning in 2002 and through the date of the hearing decision on August 27, 2009, Plaintiff first was considered a "younger individual, age 18-49" and later, as an individual "closely approaching advanced age, age 50-54." (Tr. 346). When she finally attained the "advanced age" category, and in light of her limitation to unskilled work (without transferable skills), Plaintiff was "found disabled within the framework of Rule 202.06, Table No. 2 of 20 CFR, Part 404, Subpart P, Appendix 2." (Tr. 347).

In her current appeal, Plaintiff argues that the ALJ erred: 1) in determining Plaintiff's mental RFC; (2) in failing to find that Plaintiff equaled Listing 3.02(a); and (3) by improperly assessing Plaintiff's credibility.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. . .. The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

## B. Plaintiff's Claims

### 1. Mental RFC

Plaintiff first contends that the ALJ erred in determining Plaintiff's mental RFC, by giving more weight to the opinion of Dr. Lewin, a non-examining consultant, than to the opinion of Dr. Deardorff, an examining consultant. In Plaintiff's first appeal to this Court, she succeeded in obtaining an order of remand, based on a similar claim. Then, the Court noted that Dr. Deardorff's consulting report contained opinions that "the stress and pressure of work could result in increased anxiety and decreased attention and concentration," and "could exacerbate Plaintiff's PTSD symptoms, which would interfere with her ability to relate adequately to others." (Tr. 380). The Court noted that Dr. Deardorff had concluded that Plaintiff had a GAF score of 45 at the time of his examination,

which the Court opined "alone would support claimant's ability to work and is consistent with the treatment notes of Plaintiff's primary care physician." (*Id.*). In fact, the vocational experts testified at both the first and second hearings that Plaintiff would be unable to work based on a combination of Dr. Deardorff's findings and additional physical limitations. (Tr. 381, citing Tr. 332; *see also* Tr. 712, VE testimony that Plaintiff unable to work assuming mental limitations by Dr. Deardorff, plus Plaintiff's own testimony).

This Court found Plaintiff's first appeal meritorious because "in her decision, the ALJ did not discuss Dr. Deardorff's GAF, nor did she explain why she rejected his opinion." (Tr. 381). The Court criticized the ALJ for failing to "discuss the inconsistencies between the findings of Dr. Deardorff and Dr. Lewin." (*Id.*). The Court faulted the ALJ's analysis of the mental RFC as failing "to provide the requisite narrative discussion." (*Id.*, citing SSR No. 98-8p). In fact, the record reflects that in her first decision, the ALJ barely referenced Dr. Deardorff's report and provided absolutely *no discussion at all* as to how she arrived at Plaintiff's mental RFC, other than the one-sentence conclusion that the assessment "is supported by the assessment of Dr. Lewin." (Tr. 21). Plaintiff now argues that the ALJ did not sufficiently comply with the Court's direction on remand. "[I]n her remand decision, the ALJ still offered very little explanation for rejecting Dr. Deardorff's opinion." (Doc. 13 at 12).

The issue in this appeal, then, is whether the ALJ's decision on remand contains an adequate "narrative discussion with regard to Plaintiff's mental RFC," including some explanation of the ALJ's decision to credit Dr. Lewin over Dr. Deardorff, and Dr. Deardorff's GAF score. Of course, the overarching issue is whether the mental RFC determined by the ALJ is supported by substantial evidence in the record as a whole. In reviewing the record as a whole, it is worth noting that no mental health source (including Dr. Deardorff)

has ever opined that Plaintiff is disabled from working due to mental impairments. In fact, Dr. Lewin noted that Plaintiff has "no past or current mental health treating sources." (Tr. 171).[1] The only mental RFC form completed was by Dr. Lewin, with the limitations stated therein affirmed by two additional consultants. Dr. Deardorff offered some narrative opinions, but never assessed Plaintiff's work limitations on a mental RFC form.[2]

In her remand decision, after expressly noting this Court's instruction to provide "further explanation ...concerning rejection of the opinion of Paul Deardorff, Ph.D...in June 2004," the ALJ provided the following analysis:

> [I]t is noted that Dr. Deardorff made a diagnosis of polysubstance abuse but did not state what, if any, effect he considered this to have upon the claimant's ability to function. ...It was noted that the claimant had lost jobs on several occasions in the past due to alcohol and drug abuse. It does not appear that Dr. Deardorff had available at the time of his examination much, if any, of the current medical record suggesting ongoing abuse. Therefore, he had to rely significantly upon the claimant's subjective complaints, and as discussed in the previous decision and again more fully below the claimant's subjective allegations are not fully credible. As noted by Dr. Deardorff, the claimant was fully oriented at the time of his examination and demonstrated adequate recall and memory as well as adequate attention and concentration skills... Despite this good orientation and adequate ability to think and remember, he found that the claimant would be likely to decompensate from the stress and pressure of work...In the absence of a better explanation for this finding by Dr. Deardorff, it is not accepted. Moreover, his rating of a GAF of 45 for the claimant becomes highly suspect.

(Tr. 367).

---

[1] Curiously, Plaintiff reported to Dr. Chiappone in September 2008 that she has been treated "for mood swings and PTSD," "has attended outpatient mental health treatment since age 13 off and on," and "last saw a therapist two months ago." (Tr. 481). However, Plaintiff has submitted no records from any treating mental health source other than her 1995 records relating to her suicide attempts, seven years prior to the first claimed period of disability. Plaintiff testified at the first hearing that she had more recently undergone counseling, but counsel explained that he did not obtain those records since Plaintiff had returned to work. (Tr. 321-322).

[2] Dr. Deardorff's narrative report generally offers opinions concerning the "B criteria" used to evaluate whether a claimant meets or equals a Listing for a mental impairment. In that regard, it is notable that Dr. Deardorff finds only "mild" and "moderate" limitations, rather than "marked" or "severe" limitations.

In the remand decision, the ALJ also explained why she gave greater weight to the opinion of Dr. Lewin. The ALJ first noted that Dr. Lewin reviewed the record two months after Dr. Deardorff's examination, after access to a more complete record, with her RFC opinions having been confirmed by a second reviewing psychologist in January 2005 (Tr. 156), and by a third reviewing psychologist in October 2008. (Tr. 367-368, 512). The ALJ pointed out that the last review reaffirmed Dr. Lewin's findings more than four years after Dr. Deardorff's assessment- based upon a complete review of records at that time. The ALJ credited Dr. Lewin rather than Dr. Deardorff based in part upon the fact that Dr. Lewin "noted, among other things, that the claimant had been less than honest in reporting her drug and alcohol abuse...and could be considered only partially credible overall." (Tr. 367).

Dr. Lewin's report referenced several discrepancies between Plaintiff's reports to the Bureau of Disability Determination, as contrasted with Plaintiff's report to Dr. Deardorff. In terms of her substance abuse, Dr. Lewin noted that "the [claimant] did not inform BDD of her drug and alcohol use until asked about it after the CE [Deardorff] report came in." (Tr. 171). Based upon inconsistencies, Dr. Lewin found Plaintiff's statements to be only "partially credible." (*Id.*).

In contrast to Dr. Lewin, the ALJ pointed out that Dr. Deardorff "did not even deal with the issue of the claimant's credibility or her more specific lack of candor regarding her drug and alcohol abuse." (*Id.*). The ALJ commented that Dr. Deardorff "did not catch the inconsistency between the information he was given regarding the claimant's substance abuse and the statements she had previously made to administrative personnel," and "certainly did not include in his report the type of lengthy discussion of the evidence then available that was provided by Dr. Lewin." (Tr. 367-368). Finally, the ALJ concluded that

"[i]t stands to reason that if [Plaintiff] was not truthful regarding her substance abuse history, she may also have been less than honest about the nature, frequency, and extent of her other medical problems."  (Tr. 370).

Plaintiff first argues that the ALJ misstated the record when she accused Dr. Deardorff of failing to state what, if any, effect he considered Plaintiff's polysubstance abuse to have upon Plaintiff's ability to function.  Plaintiff contends that Dr. Deardorff considered polysubstance abuse in assigning a low GAF score.  However, since there is no specific reference in Dr. Deardorff's report to substance abuse in the paragraphs assessing Plaintiff's GAF, I find no error in that respect.  In contrast, I agree that Dr. Deardorff appeared to consider the effect of Plaintiff's substance abuse to when he opined that her impaired mental ability to withstand work stress "might result in increased drug and alcohol use."  (Tr. 139, emphasis added).  On the other hand, Dr. Deardorff offers no definitive opinions concerning work limitations (*i.e.*, he suggests only that work stress "might result" in increased substance use).  Therefore, the ALJ was correct to the extent that Dr. Deardorff did not specifically assess the degree of work limitations caused by Plaintiff's substance abuse issues.

Plaintiff also criticizes the ALJ's reference to Plaintiff's having lost jobs in the past due to drug and alcohol abuse.  Dr. Deardorff's report reflects that Plaintiff told him that she had held "a lot" of jobs and that she had "worked 'pretty much' steadily but has been terminated on six to seven occasions due to drug and alcohol related difficulties." (Tr. 135).  Plaintiff points to a single "work history report" completed in April 2004 during the disability application process, wherein Plaintiff reported that she held the same position for a five-year period of time, from 1997-2002.  Plaintiff extrapolates an argument from that report

that her difficulties in keeping a job must have occurred "several years prior to her application for disability benefits and therefore should have no bearing" on her claim. Aside from being highly speculative (as to the date of prior job losses), and having questionable relevance to the ALJ's rejection of Dr. Deardorff's opinion, Plaintiff's reliance on the single April 2004 record is contradicted by other reports by Plaintiff that reflect a more checkered substance abuse and work history.

Plaintiff additionally argues that the ALJ wrongfully criticized Dr. Deardorff for failing to review records "suggesting ongoing abuse," (Tr. 367), because updated medical records were not submitted until after November 2004. However, the ALJ properly explained that her rejection of Dr. Deardorff's opinion was based not on his failure to review records that did not then exist, but on his inability to access "the current medical record." (*Id*.). As the ALJ noted, subsequent consulting psychologists did have access to and reviewed updated records, which suggested ongoing substance abuse issues, as discussed below. Two consultants affirmed Dr. Lewin's assessment long after Dr. Deardorff's examination, with the last consultant reviewing records in October 2008. So long as an ALJ considers valid factors and her decision is supported by substantial evidence, an ALJ may appropriately give greater weight to the opinions of a non-examining consultant than to the opinion of even a treating physician *See Blakley v. Commissioner of Social Security*, 581 F.3d 399, 409 (6th Cir. 2009)("In appropriate circumstances, opinions from State agency medical...consultants...may be entitled to greater weight than the opinions of treating or examining sources," quoting Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3 (July 2, 1996)).

In a related argument, Plaintiff argues that the ALJ was wrong to discount Dr. Deardorff's report based upon Plaintiff's "lack of candor regarding her drug and alcohol

abuse," and/or the ALJ's own credibility assessment. "The ALJ cannot assume that there was an issue of credibility with the expert hired by the Administration, when the expert himself did not see it as an issue." (Doc. 13 at 14). To the contrary, it is beyond cavil that it is not only permissible but required in most cases for an ALJ to independently assess the claimant's credibility. The fact that a consulting expert who does not have access to the full record may have a less critical opinion of Plaintiff's credibility does not undermine the substantial evidence that supports the ALJ's opinion.

Plaintiff further contends that the ALJ erred in describing the low GAF score of 45 by Dr. Deardorff as "highly suspect." Plaintiff notes that nearly a decade earlier, in 1995, she was admitted on three different occasions for attempted suicide, and that primary care physician records noted she was tearful, anxious and depressed. Again, I find no error.

Plaintiff's emphasis on GAF scores found by two consultants, including Dr. Deardorff, is somewhat misplaced. The GAF Scale reports an individual's overall level of functioning at a particular point in time, with higher scores reflecting higher functioning. While GAF scores may be considered, "[t]he Commissioner 'has declined to endorse the [GAF] score for "use in the Social Security and SSI disability programs," and has indicated that [GAF] scores have no "direct correlation to the severity requirements of the mental disorders listings.'" *DeBoard v. Comm'r of Soc. Sec.*, 211 Fed. App'x 411, 415 (6th Cir. 2006)(additional quotations omitted). Thus, absent evidence that Plaintiff meets a mental disorder listing, or that substantial evidence in the record as a whole did not support the mental RFC determined by the ALJ,[3] the ALJ's rejection of any particular GAF assessment

_____

[3] The fact that records from Plaintiff's primary care physician are "consistent" with Dr. Deardorff's report because they reflect that Plaintiff was tearful and depressed does *not* mean that Plaintiff's mental limitations were so severe as to render her disabled from all employment.

does not provide grounds for further remand.

Finally, Plaintiff argues that Dr. Deardorff's opinion should have been accepted insofar as it was consistent with the later opinion of Dr. Chiappone, another consulting psychologist who examined Plaintiff in September 2008 after remand. Dr. Chiappone diagnosed polysubstance dependence, in remission, PTSD and major depression, with a GAF score of 48. (Tr. 485). Plaintiff argues that it was error for the ALJ to find only moderate work limitations when two examining consultants both recognized, based upon their assessments of Plaintiff's GAF score, that Plaintiff suffers from "serious" symptoms. Again, however, the GAF score does not easily translate into work limitations. In this case, the ALJ explained in some detail why she believed that the reports of the examining consultants, with their emphasis on Plaintiff's subjective reports and without review of Plaintiff's records as a whole, including but not limited to contradictions and inconsistencies relating to Plaintiff's credibility, were not entitled to the same weight as she gave to the mental RFC assessments determined by the non-examining consultants.

The ALJ explained that she was giving Dr. Chiappone's conclusions regarding Plaintiff's level of impairment and GAF score only "limited weight" because Plaintiff "was not honest with him concerning her continuing alcohol abuse or the true longevity of her past relevant work." (Tr. 368). For example, during "the same month that she denied continuing drug or alcohol abuse to Dr. Chiappone, the claimant had a positive toxicity screen for opioids, barbiturates, marijuana, and alcohol." (Tr. 369).

Even if Dr. Chiappone's opinions had been credited, Defendant persuasively argues that Plaintiff fails to demonstrate how they would translate into greater mental work-related limitations. Like Dr. Deardorff, Dr. Chiappone conducted a clinical interview but did not

14

review records or complete a mental RFC form. Dr. Chiappone opined that Plaintiff is not impaired at all in her ability to understand simple job instructions, and is only "mildly" impaired in her ability to remember such instructions. (Tr. 485). She is "mildly" impaired in her ability to maintain concentration and attention, particularly over time. She is "moderately impaired in her ability to related to co-workers, supervisors, and the public," as well as in "stress tolerance." (*Id*.). Like Dr. Deardorff, Dr. Chiappone found no "marked" or "severe" limitations in any area.

The record reflects that the ALJ agreed with Dr. Chiappone in finding that Plaintiff "has moderate difficulty maintaining social functioning" and "moderate difficulty maintaining concentration, persistence, or pace" concerning the B criteria used at sequential steps 2 and 3 to determine the severity of a mental impairment and whether it meets a listing (Tr. 368). The ALJ incorporated those limitations into Plaintiff's mental RFC, at steps 4 and 5, by stating that she has "moderate limitation in her ability to relate to others and in her concentration, persistence and pace," (Tr. 369), and by concluding that Plaintiff would require "routine work settings which involve minimal contact with others." (*Id*.). Plaintiff fails to explain what greater mental limitations should have been included but were not. In short, I find that the ALJ complied with the remand instructions by providing a sufficient narrative explaining the basis for her determination of Plaintiff's mental RFC, and that her decision in this regard is supported by substantial evidence.

## 2. Listing 3.02(a)

Like Plaintiff's first claim, plaintiff's second claim of error- that the ALJ failed to find that Plaintiff's chronic obstructive pulmonary disease "equaled" Listing 3.02(a) - was previously presented to this Court. During the course of Plaintiff's prior judicial

proceedings, the Court explained that remand was required because, in addition to the failure of the ALJ to explain the basis for Plaintiff's mental RFC and another error concerning her failure to note Plaintiff's back pain, the record was silent concerning whether the ALJ had considered whether Plaintiff's COPD could equal the referenced Listing, when considered in combination with those other impairments.

> Listing 3.02(a) mandates an award of benefits to an individual with COPD, due to any cause, with the FEV1[4] equal to or less than the values corresponding to the person's height. The Listing specifies that the results should be the largest of at least three satisfactory forced expiratory maneuvers and the test should be repeated after an administration of a bronchodilator. 20 C.F.R. Part 404, Subpart P, Appendix 1, §3.00(E).

(Tr. 383, footnote original).

The Court acknowledged there is no dispute that Plaintiff suffers from COPD, and that her disease is more than "mild." (*Id.*). However, the Court also agreed with the ALJ that the record did not show that Plaintiff's COPD "meets" the Listing based upon her FEV1 levels. The Court explained:

> A pulmonary function test in February of 2004 showed an FEV1 of 1.70 with Plaintiff's height being 65 inches. (Tr. 183). In May of 2004, at the request of the Administration, Plaintiff underwent additional pulmonary function testing. The FEV1 readings on the three attempts were 1.17, 1.23 and 1.26 respectively, with Plaintiff's height listed at 63 inches. (Tr. 142). Regardless of the discrepancy in Plaintiff's height between February and May of 2004, a test result of 1.26 ("the results should be the largest of ...three...maneuvers") is not equal to or less than the requisite 1.25 listing level. Accordingly, the ALJ properly determined that Plaintiff's FEV1 testing results were not equal to or less than the requisite level.

> However, Plaintiff also alleges that when considering COPD in combination with her severe back pain and depression, the evidence equaled the Listing...If Plaintiff's impairment or combination of impairments is medically

---

[4] FEV1 is the acronym for "Forced Expiratory Volume in the First Second." FEV test results are expressed in liters. Linda Cocchiarella & Gunner B.J. Andersson, *Guides to the Evaluation of Permanent Impairment*, American Medical Association, p. 99 (2001).

equivalent to one in the Listing, disability is presumed and benefits are awarded....

(Tr. 384).

The Court remanded because the it could not determine, based on the ALJ's first written decision, whether the ALJ's decision that Plaintiff's COPD did not "equal" Listing 3.02(a) was supported by substantial evidence.

> [B]ased upon a review of the record, the assignments of error, and the law, the undersigned recommends that the Court find that substantial evidence supports the ALJ's decision that Plaintiff's COPD, alone, does not meet Listing 3.02(a). However, the record does not reflect that the ALJ considered Plaintiff's impairments in combination. Accordingly, the Court is unable to properly exercise its responsibility under 42 U.S.C. §405(a). Therefore, the undersigned recommends that the instant case be remanded for a statement of factual conclusions and narrative that the ALJ considered Plaintiff's impairments in combination and determined that they do not equal the Listing 3.02(a).

(Tr. 386). In Plaintiff's current appeal, this Court must decide whether substantial evidence supports, the ALJ's analysis and determination in her remand decision that Plaintiff's COPD does not equal Listing 3.02(a).

After specifically noting the Court's instruction to provide "a statement of factual conclusions and narrative showing that consideration had been given to the claimant's impairments in combination in determining that they do not equal section 3.02," the ALJ provided extensive analysis in her remand decision:

> Counsel for the claimant has cited a pulmonary function study performed in May 2004 that yielded a highest FEV1 value of 1.26....While it may be true that that value was "just barely over" the regulatory table,...counsel..noticeably made no reference to a pulmonary function study performed three months earlier in February 2004 that yielded an FEV1 of 1.70 without the use of bronchodilator medication...Taken as a whole, the record during the earlier alleged closed period of disability therefore did not reflect that the claimant's breathing values were consistently close to meeting the regulatory table for section 3.02.

(Tr. 366). The ALJ went on to discuss, at some length, pulmonary function studies from May 2007 (yielding an FEV1 result of 1.68), April 2008 (FEV1 value of 1.21), and October 2008 (FEV1 value of 1.36). The ALJ relied cited the October 2008 opinion of a reviewing physician who opined:

> that the May 2007 testing was the most representative of the claimant's pulmonary function because it included a DLCO, a volume study, and a spirometry, although the DLCOs of the studies in May 2007 and April 2008 were felt to be underestimates because they were not corrected for anemia that the claimant apparently had during the time of testing. The reviewing physician further stated that the only study with interpretable tracings to verify the claimant's effort was the one performed in October 2008, and that these in fact showed suboptimal effort. He commented that the April 2008 testing was likely done in a non-baseline state, and that the studies as a whole show that there has not been significant worsening of the claimant's breathing condition since the time of the previous administrative law judge decision in May 2007...Given this reasonable medical interpretation of the three most recent pulmonary function studies of record, it is found that the claimant's breathing volumes continue to be significantly above the level required by the regulatory table....It is also noted that she continues to smoke....
>
> Accordingly, nothing in the treatment or examination records establishes that the claimant has ever had a pulmonary condition so close to meeting section 3.02 that any additional limitations produced by her back condition or psychological impairment would be sufficient to produce a combination of limitations of listings level severity. Instead, the claimant has a pulmonary condition that, although severe, allows her to perform a rather impressive list of daily activities. Moreover, that condition did not keep her from working at the substantial gainful activity level for almost three years between March 2005 and January 2008. No doubt, her respiratory status would improve if she stopped smoking.

(Tr. 366). After noting that the Plaintiff had received minimal treatment for her back and mental impairments, which suggested that she "does not find her lower back discomfort to be all that limiting," (Tr. 367), the ALJ commented specifically on Plaintiff's credibility issues and ample evidence of ongoing tobacco abuse, despite testimony that she had stopped smoking entirely.

> Not only does this evidence further detract from the claimant's credibility...,
> it also shows that she has not taken readily available measures to alleviate
> her breathing problems and overall medical condition in a manner that would
> be expected from someone who has a combination of impairments of listings
> level severity.

(Tr. 367).

In this second judicial appeal, Plaintiff argues that the ALJ should have found that she "equaled" the Listing because her FEV1 values were "so very close to listing levels," (Doc. 13 at 17), and Plaintiff has proven additional severe impairments of back pain and mental illness. However, it remains Plaintiff's burden to show that she met or equaled the Listing. *See Bowen v. Yuckert*, 482 U.S. 137, 147 n. 5 (1987). Having reviewed the ALJ's opinion on remand, I now conclude that substantial evidence supports the ALJ's determination that Plaintiff failed to satisfy her burden at Step 3.

As the Commissioner points out, three of Plaintiff's FEV1 values (from February 2004, May 2007, and October 2008) significantly exceed the threshold specified in Listing 3.02(a),[5] and therefore greatly undermine Plaintiff's argument. The ALJ further explained that Plaintiff does not exhibit the type of severe symptoms, given her level of daily activity, work history, and continued use of tobacco, that would suggest COPD close to listing level severity. The ALJ also relied upon the medical opinions of reviewing consultant Dr. Freihofner, and provided a reasonable explanation of why Plaintiff's back impairment and mental limitations do not tip the scales to listing level equivalency.

In her current appeal, Plaintiff primarily attacks the ALJ's reliance upon reviewing

---

[5] The threshold specified in the Table for the listing requires a FEV1 value equal to or less than 1.25 for someone who is 64-65 inches. Plaintiff's height was variously reported as 63 to 65 inches. A height of 63 inches would have required an even lower FEV1 value of 1.15 or less, but the ALJ gave Plaintiff the benefit of the doubt in using the higher value.

medical consultant, Dr. Freihofner. Plaintiff first argues that the ALJ erred by finding the "most representative of the Plaintiff's pulmonary function" to be the May 2007 test data, because that data was obtained during the period of time in which Plaintiff was employed. The ALJ explained that she agreed with the consulting physician that the May 2007 data was representative because that testing included more complete data than other dates. (Tr. 366, 528). While it is true that Plaintiff underwent that testing during a period of employment, Plaintiff repeatedly maintained that her COPD was unchanged and disabling while she was working, and that she was only able to work due to exceptional accommodations made by her employer. (Tr. 288, 312, 691-92). Moreover, the April 2008 results (after Plaintiff had been laid off due to lack of work) indicated no significant change from the May 2007 results, the latter of which showed "normal lung volumes and normal diffuse capacity with good response to bronchodilator. " (Tr. 605; see also Tr. 366, 528, 608). Therefore, I conclude that the ALJ's finding that the May 2007 data was fairly "representative" of Plaintiff's functioning was supported by substantial evidence.[6]

Plaintiff may well wish to rely on the April 2008 FEV1 value of 1.21 (but not the conclusion of her "unchanged" condition), because the April 2008 FEV1 value was the only one that fell below the listing level. However, the ALJ reasonably discounted the April 2008 FEV1 value for two reasons. First, Dr. Freihofner testified that Plaintiff continued to suffer from anemia at the time of that test, and opined that the test was likely performed in a non-baseline state. (Tr. 366, 528-529). Plaintiff had been prescribed iron pills for anemia in

---

[6] Despite finding the May 2007 test results to be fairly representative of Plaintiff's pulmonary function, the ALJ also noted the consulting physician's opinion that the FEV1 value was likely an under-representation due to the possibility that Plaintiff had undiagnosed anemia at that time. Plaintiff was diagnosed with anemia in February 2008.

February 2008, but admitted in August of that year that she had not been taking them. (Tr. 470, 627). Section 300E requires tests to be performed when the individual is stable, and not suffering from an asthmatic attack or other chronic illness (such as anemia).

In her reply memorandum, Plaintiff argues that Dr. Freihofner's opinion that Plaintiff was still suffering from anemia was "pure speculation." However, the record reasonably supports the ALJ's reliance on Dr. Freihofner's hypothesis. Even if Plaintiff's anemia was not considered, a second reason exists to invalidate the April 2008 FEV1 result. The regulations require "at least three satisfactory forced respiratory maneuvers," and the April 2008 test reflects only one trial of post-bronchodilator spirometry, not three. Therefore, the April 2008 test does not prove that Plaintiff met or equaled the listing.

Plaintiff also relies upon the much earlier May 2004 study, during which the highest obtained FEV1 value was 1.26 -close to - but still above -the Listing FEV1 value of 1.25. However, the May 2004 study results also were invalid under §3.00E, which requires repetition after administration of a bronchodilator when a pre-bronchodilator FEV1 value is below 70 percent. 20 C.F.R. Part 404, Subpt. P., App. 1, § 3.00E. The May 2004 pre-drug FEV1 spirometry reading was 52% of predicted value, but the spirometry was not repeated after administration of a bronchodilator. (Tr. 141-142). The regulation clearly bars use of "[p]ulmonary function studies performed to assess airflow obstruction without testing after bronchodilators..." *Id*. Therefore, the May 2004 test, aside from still being *above* the requisite Listing value, cannot be used to support Plaintiff's argument that her COPD equaled Listing 3.02(a). In fact, a reviewing consultant, Dr. Morton, opined that both

February and May 2004 tests[7] showed only a mild reduction of pulmonary function inconsistent with the Listing. (Tr. 152). *See also Price v. Heckler*, 767 F.2d 281, 284 (6th Cir. 1985)(close not close enough to carry burden at Step 3 of sequential analysis).

Based on his review, Dr. Freihofner concluded that none of Plaintiff's pulmonary function tests had verifiable data that fully complied with the regulatory requirements with the exception of the October 2008 study. (Tr. 529). However, Dr. Freihofner opined that Plaintiff exhibited "suboptimal effort" during that test. Plaintiff additionally argues that the ALJ erred in relying on this opinion, because the examiner administering the test reported that Plaintiff had "good understanding and effort" and that the results were "consistent." (Tr. 516).

I find no error requiring remand. Dr. Freihofner's analysis reflects his medical judgment in interpreting the October 2008 tracings in the record. Both parties urge this Court to review the same tracing graphs, (Tr. 519-522), to determine whether the results either do or do not show optimal effort for the requisite number of seconds specified in the regulation. This Court need not resolve the interpretive dispute, because there is no question that the October 2008 study reflects a FEV1 value of 1.36, well *above* the Listing requirement after a "positive response" to administration of a bronchodilator. (Tr. 516-517). Thus, even if Dr. Freihofner erred in his medical judgment, this minor error would not have affected the result in this case.

Plaintiff briefly suggests that the ALJ erred by failing to review a November 2008 study, but the ALJ's opinion specifically cites to Exhibit 18F, which includes the November

---

[7] Plaintiff's argument that Dr. Morton failed to review the May 2004 result, (*see* Doc. 20 at 3), is flatly contradicted by Dr. Morton's report, which refers to the May 18, 2004 testing data. (Tr. 147, 152).

2008 treatment records. (Tr. 367, 370). It is true that the ALJ's opinion does not discuss each and every page of the referenced exhibit, but the law does not require such a standard. *See Walker v. Sec'y of Health and Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989)(An ALJ is not required to discuss every piece of medical evidence in the record). Moreover, the November 2008 test does not show that Plaintiff equaled the listing, because it did not contain a FEV1 test value, and states that Plaintiff's bronchospasm was reversible with treatment. (Tr. 535, 542).

Plaintiff also cites to a treating physician's opinion (Dr. Cantor) that her COPD was of a disabling severity in 2004. However, this Court previously found no error in the ALJ's prior rejection of that opinion, and I find no error upon additional review. Plaintiff testified that she switched primary care physicians from Dr. Cantor to Dr. Kaminski, that her new physician changed her medications and that Plaintiff reduced her smoking, and that her COPD improved at that time. (Tr. 311).

In contrast to Plaintiff's reliance on the unpersuasive evidence including the May 2004, April 2008, and October 2008 FEV1 values, the ALJ's conclusion that Plaintiff's COPD neither met nor equaled the listing in this case is supported by a number of medical records that reflect instances when Plaintiff's respiratory examination was normal and she was experiencing no issues with shortness of breath (Tr. 444, 469, 488, 582, 592, 631). At other times, Plaintiff's primary care physician noted that her breathing had improved after she decreased her smoking. (Tr. 173-174). In August and September 2008, Plaintiff's reports reflected "well managed" and/or "stable" COPD on medications. (469, 487, 490). Despite a flare-up of COPD symptoms in February 2009, Plaintiff reported she was "much better" after additional medications were prescribed. (Tr. 625). These records provide

additional support for the ALJ's conclusion that Plaintiff's COPD, even with additional consideration paid to Plaintiff's mental health and back impairments, did not "equal" Listing 3.02(a).

Finally, Plaintiff criticizes the ALJ's failure to retain and call a medical expert to testify as to whether Plaintiff's combination of impairments equaled a Listing. (Doc. 13 at 19). The Commissioner argues - with some justification - that Plaintiff's one-sentence critique of the ALJ for failing to retain a medical expert is so conclusory an argument as to be waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997). Even if not waived, Plaintiff's argument fails to persuade. "Social Security proceedings are inquisitorial rather than adversarial," such that an ALJ has a duty "to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 111 (2000)(citation omitted). However, ordinarily an ALJ "has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d at 357 (citing 20 C.F.R. §404.1517). In this case, the ALJ reasonably concluded that "nothing in the treatment or examination records establishes that [Plaintiff] has ever had a pulmonary condition so close to meeting [Listing] 3.02 [such] that any additional limitations produced by her back condition or psychological impairment would be sufficient to produce a combination of limitations of listings level severity." (Tr. 366). The ALJ's analysis that Plaintiff did not "meet or equal" the Listing was supported by the opinions of agency physicians (Tr. 33-34, 527-34), and other substantial evidence in the record as a whole.

### 3. Credibility Analysis

Plaintiff's third assignment of error accuses the ALJ of wrongfully assessing her

credibility. An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Further, a credibility determination cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Thus, it is proper for an ALJ to discount the claimant's testimony where there are contradictions among the medical records, her testimony, and other evidence. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d at 387, 392 (6th Cir. 2004).

Here, the ALJ found that Plaintiff was not a credible witness, noting that "she was less than honest about her smoking history, her history of alcohol abuse and her history of abusing prescription medication." (Tr. 369). More than substantial evidence exists to support the ALJ's credibility analysis in this case.

For example, Plaintiff repeatedly testified that she stopped using drugs and alcohol in 2002, except for a brief relapse in June 2005. (Tr. 20-21, 301-02, 319-320). She testified that she has not had any alcohol since that relapse date. (Tr. 683). However, medical records reflect weekly drinking, sometimes to the point of intoxication, and marijuana use around June 2004 (Tr. 104, 135), as well as use of alcohol in 2007 and 2008. (Tr. 452, 540, 604, 629). In September 2008, Plaintiff reported regularly drinking four to six beers on the weekends (Tr. 487-488), an amount that would equal 16-24 beers per month. Yet, she reported the same month to Dr. Chiappone that she consumes 10 beers per month. (Tr. 481).

A positive drug screen in September 2008 conflicted with Plaintiff's representations

to Dr. Chiappone that she had stopped using drugs "years ago" and was "substance-free." (Tr. 368-369, 481, 484, 487-88). Plaintiff also testified that she took prescription drugs without a prescription on only one occasion in September 2008 (Tr. 683-684). However, records reflect she took her partner's Percocet more than once (Tr. 452), and had a history of seeking narcotics, with one physician noting "lots of [narcotic] medicine" for back pain, despite the lack of any radiculopathy, and other physicians expressing concern about drug-seeking behavior and declining to prescribe narcotics. (Tr. 23, 174, 180, 189, 213-214, 369, 452, 602, 630).

In addition to the inconsistencies regarding Plaintiff's tobacco, drug and alcohol use, the ALJ noted inconsistencies concerning Plaintiff's pain complaints. For example, although Plaintiff testified in August 2009 that she took Tylenol-3 for back discomfort every day, and had been doing so for four or five months, the records reflected "very little treatment overall" with only intermittent references to back pain (Tr. 365-66). Plaintiff complained that her doctor "doesn't want to treat me for my back" (Tr. 429), but records reflect that she refused recommended therapy for her back because she did not "have time for PT/OT," (Tr. 447), a stance that was inconsistent with the level of disabling pain that Plaintiff alleged. (*See also* Tr. 370, 443-444). The ALJ also discussed other factors affecting Plaintiff's credibility, including the opinion of Dr. Freihofner, Plaintiff's work history, and Plaintiff's numerous activities of daily living. Plaintiff complains that the ALJ did not sufficiently consider the fact that she testified that she needed breaks when working and when performing chores, but the ALJ explicitly considered that testimony, and decided that Plaintiff's testimony was not fully credible. (Tr. 364).

Plaintiff argues that regulations state that continued smoking against the advice of

a doctor does not per se disqualify an otherwise disabled Plaintiff from receiving disability benefits. 20 C.F.R. §1530(a). Of course, in this case Plaintiff was found not to be disabled. In any event, the regulations permit an ALJ to consider a claimant's failure to adhere to medical advice, including continuing to smoke. *See Singleton v. Astrue,* 2011 WL 6056917 (S.D. Ohio, Dec. 6, 2011); *Sias v. Sec'y of Health & Human Servs*., 861 F.2d 475, 480 (6th Cir. 1988). The regulations additionally *require* the ALJ to consider inconsistencies in the record. Here, the ALJ noted that Plaintiff "testified very clearly at the hearing that she stopped smoking about one year ago, and...has not had any relapses where she returned to smoking," (Tr. 682), yet medical records reflected ongoing tobacco use as late as February 2009. (Tr. 367, 369, 536, 540, 626, 628).

Plaintiff also contends that she has "consistently reported" her alcohol use, such that the ALJ erred in finding her "less than honest" about her drug and alcohol use. Acknowledging her September 2008 urine screen that was positive for opioids, barbiturates, cannabinioids and alcohol (Tr. 491), Plaintiff argues that her "one time positive tox screen is not indicative of an ongoing problem." (Doc. 13 at 20). However, as discussed above, multiple records reflect Plaintiff's inconsistent reports concerning both drug and alcohol use, suggesting a much longer-standing problem. Plaintiff also argues that her September 2008 marijuana use was "the one and only reference to marijuana abuse...other than use several years prior to her claim." (*Id*.). Again, however, the record contradicts this argument insofar as Plaintiff admitted to this use only after prompting (after initially denying use of street drugs) (Tr. 683-684), and other records show prior marijuana use in 2004 (Tr. 104,135).

In sum, the ALJ's assessment of Plaintiff's credibility does not provide grounds for

reversal or remand, because it is supported by substantial evidence in the record.

### III.  Conclusion and Recommendation

For the reasons explained herein, **IT IS RECOMMENDED THAT** Defendant's most recent decision be found to be **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED**, and that this case be **CLOSED.**

 /s Stephanie K. Bowman

Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

MARY BECKER,                                    Case No. 1:11-cv-438

        Plaintiff,                              Dlott, J.
                                                Bowman, M.J.

    v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## NOTICE

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).